STERLING NATIONAL BANK & TRUST COMPANY OF NEW YORK, as Trustee, Plaintiff, *v.* 31 WEST 72ND ST. CORP. et al., Defendants.

Supreme Court, Additional Special Term, New York County, December 7, 1944.

*Glass & Lynch* for plaintiff.

*Shaine & Weinrib* for 31 West 72nd St. Corp., defendant.

*White & Case* for Huron Holding Corp., defendant.

*David W. Kahn* for committee for Hotel Olcott first mortgage certificates.

. BOTEIN, J. This action was brought by the plaintiff to foreclose the consolidated mortgage which it holds as trustee, covering the hotel premises at 27–31 West 72nd Street, city of New York. Upon motion of the trustee, and pursuant to provisions of sections 119 to 123 of the Real Property Law (Burchill Act), a referee was appointed to take testimony and report as to the fairness, equitableness and feasibility of a plan of reorganization proposed by the trustee, or of any alternative plan which might be proposed by any party in interest.

Three plans have been submitted to the referee for his consideration. Plan (A), which is submitted by the trustee, embodies the conventional provisions, whereunder it is proposed that a new corporation controlled by certificate holders be formed to take title to and manage the mortgaged property. Plan (B) provides for the acquisition of title, for a specified

consideration, by a corporation to be controlled by a group identified with the equity owners of the hotel. Plan (C) provides that the mortgaged property be sold " at the best price obtainable ", with approval of the court, but that in the event a sale shall not be consummated, the court is to appoint one or more trustees to operate the mortgaged premises for the sole benefit of certificate holders under a declaration of trust similar in form to those heretofore used in Schackno Act (L. 1933, ch. 745, as amd.) and Mortgage Commission Act (L. 1935, ch. 19) reorganizations.

Plan (C), which is submitted and supported only by the holder of one small bond, sounds a lone but encouraging note of realistic thinking in trust mortgage reorganizations. This plan accepts the Burchill Act mandate to liquidate and grapples with the challenge presented, when, as in this case, the prognosis for a moribund property in the hands of bondholders is not encouraging. It recommends surgery through sale as the most desirable procedure. The referee has rejected plan (B), inasmuch as it does not permit of competitive bidding to test the market.

The referee has skillfully woven major aspects of plans (A) and (C) with certain progressive features which he sponsors, into a proposed plan which blazes new trails in reorganization techniques. The plan really divides into two alternative parts. The first part provides that prior to foreclosure of the mortgaged property, efforts be made to sell on the open market, subject to the approval of the court, upon terms and in a manner hereinafter discussed. The second, or alternative part of the plan provides that in the event a sale be not consummated, then the plaintiff, as trustee, shall acquire the property at foreclosure sale for transfer to a so-called 100% certificate holders' corporation.

I shall first discuss at some length the provisions of the plan relating to the proposed sale of the property, since it represents the first studied procedure to submit such an alternative to certificate holders as part of the plan in a Burchill Act proceeding. There has been submitted to bondholders in another and prior reorganization one proposal to sell, but that stemmed from the exigencies of the moment rather than, as here, from a comprehensive procedure evolved by the referee and a group of bondholders, designed to elicit the best price in the open, competitive market, while ringing the process with certain safeguards for certificate holders.

I greatly favor the exertion of all reasonable efforts to sell the property at this time at a fair and equitable price. Where the mortgaged property has been acquired on behalf of bondholders, a sale as expeditiously as possible at a fair market price generally affords the greatest measure of protection to those bondholders who most need protection. Such supervision as I have been able to exercise over trustees or directors and officers of bondholders' corporations, persuades me that many of them are men who accept their designations and execute their duties with a high consciousness of the responsibilities involved. But even the most high-minded, most resourceful and most experienced fiduciary representation is, at best, part time application to duties by men whose principal income and interests lie elsewhere, and who cannot therefore cope on terms of complete equality with the intensity of application of men who devote full time, energies and thought to the ownership and management of competing properties.

I have found that in only one class of properties administered on behalf of bondholders is the management comparable to that of privately owned properties. This is in reorganized properties where an individual or a group have purchased a so-called position, that is, acquired so substantial a portion of the stock and bonds outstanding as to enable them to vote in their own designees as officers and directors. These groups sometimes succor bondholders by magnificent rehabilitation of the properties, but sometimes they pursue a policy of depressing the market prices of bonds until they have acquired all or most of the outstanding bonds between the pincers of a sinking fund operation and purchases on the open market at distress prices. In these cases the properties are well operated, as the management is considered a full-time job by men who have every reason to believe they will become equity owners of the properties. Obviously, this type of operation may inherently be more dangerous to small bondholders than the representative operation previously mentioned.

It is because of this limited outlook that I have encouraged all efforts to test the market for the sale of mortgaged properties, even at the risk of missing the uppermost peak in the future price range.

The referee considered and rejected a proposal that the property be auctioned off at the foreclosure sale after provision would first have been made for an all-cash upset price. He has stated the following in this regard, and I fully approve and adopt his reasoning: " I do not recommend that the property

be disposed of at a fixed price at a foreclosure sale. In a fore-closure sale the Court retains no substantial control or super-vision after establishing an upset price. The circumstances here warrant closer scrutiny and supervision by the Court to safeguard the interests of the certificate holders. The Court should possess the faculty to accept, reject or modify offers of cash and terms. This flexibility is so far superior to the single act of setting a cash upset price that I feel that the use of a foreclosure sale and upset price is not advisable. Further-more, the use of a foreclosure sale and distribution immediately thereafter makes no provisions for securing full consideration or acceptance of that sale by the certificate holders."

The referee recommends specifically that the property be sold at or above a minimum price for all cash or on terms pursuant to a plan which must first be presented to and approved by the certificate holders. It is proposed that a plan author-izing the court to order the sale of the mortgaged property at a minimum price of $720,000, if all cash, or at a minimum price of $765,000, if on terms, (in which latter contingency a minimum cash down payment equal to 25% of the purchase price shall be required, the balance by way of a ten-year purchase-money bond and mortgage), be submitted to the certificate holders for approval, as part of the plan of reorganization in the manner required by the Burchill Act. All of the certificate holders' representatives who appeared before the referee approved the minimum prices as recommended.

It is proposed that the plan should also set forth the following:

All offers are to be submitted directly to the court and shall be in the form of sealed bids, clearly setting forth the terms of purchase. In the case of offers to purchase on terms, the financial responsibility and business background of the offeror shall also appear. Each offer shall be accompanied by a certi-fied check in the sum of $10,000 as a deposit, payable to the order of plaintiff as trustee, which deposit shall be returned in the case of all unsuccessful offers.

In the event of a sale on terms, the purchase-money bond and mortgage shall bear interest at the rate of 4% per annum with such annual constant amortization payments as the court may deem proper, both payable quarterly, and shall contain such other terms as the court, in its discretion, may determine. Such bond and mortgage shall be held by a trustee under a trust indenture which shall provide that amortization payments shall be received and applied by the trustee to a sinking fund to reduce the mortgage indebtedness. Provisions, subject to

the approval of the court, are made for advertising for the submission of offers and, that a date certain shall be designated as the last day upon which offers may be received or entertained. The offers so received shall be considered by the court at a date certain subsequent thereto.

The court shall determine, in its discretion, the offer which it considers most favorable, without requiring such offer to be the highest bid, provided, however, that such offer shall conform to the minimum price of $720,000 if all cash, or to the minimum price of $765,000 if on terms. In the event that none of the offers submitted shall meet with the approval of the court, it may, in its discretion, permit the offeror submitting the offer which it deems most favorable to improve his offer, and to submit such improved offer for the further consideration of the court. Thereafter, the court may accept or reject such new offer, but no other offers shall be received or considered.

The plaintiff, as trustee, shall acquire title to the mortgaged property at the foreclosure sale thereof either for transfer to the successful offeror, or for conveyance to a new corporation to be formed pursuant to the plan of reorganization in the event no sale be consummated.

In the event that a sale be consummated, the cash proceeds thereof, together with the net funds remaining with plaintiff, as trustee, from the operation of the mortgaged property, shall be distributed pro rata to the certificate holders, after first deducting therefrom all expenses of reorganization, operation and sale.

In the event that the mortgaged property be sold on terms and if, as part payment therefor, a purchase-money mortgage shall be accepted, the terms thereof shall be subject to the approval of the court and if it should be necessary to have a trustee act pursuant to a trust indenture, then the court shall appoint such trustee and shall approve such trust indenture.

I again quote with approval from the referee's report: " Under the recommended procedure, the Court would have a mandate from the certificate holders, who will have given their consent in advance, setting the minimum price and the minimum terms. The Court would have an opportunity to scrutinize the offers submitted, the method of their submission, the relative merits of their terms, and the security which the financial status of the offeror would afford the certificate holders. This means that the Court would be free to accept an offer of less cash than would be required by a reasonable upset figure, but which offer could be considered more favorable to the certificate

holders because of the credit terms attached thereto. These considerations indicate the type of sale-flexibility lacking in the typical foreclosure sale and distribution, and lead me to recommend the type of sale which I shall now proceed to describe in greater detail.''

Upon the argument of the motion to confirm the referee's report, there was some discussion as to the relative merits of procedures to secure offers by sealed bids and by court supervised auction. It was the consensus of court and counsel that the sealed bid procedure is preferable, for although it removes the stimulus of face-to-face competition, it also eliminates the possibility of combinations to press down the price. This latter consideration is most important in the sale of a specialty property like a hotel, which presents more of the aspects of a going business than of real estate to a potential purchaser, and which would therefore attract a limited number of bidders.

A modification of the provisions for the sale of the property as recommended by the referee was proposed upon the argument of the motion herein by the plaintiff trustee, but seemingly received little, if any, certificate holder support. The trustee contended that the pattern for the procurement of offers as recommended by the referee should be followed in the main, but that bids should be sought and received first, and that then the successful offer, if approved by the court, should be submitted to the certificate holders for their approval. The trustee urged that the certificate holders would thus have the last word on any offer.

It seems to me that the certificate holders do have the determinative, if not the chronologically final word, under the referee's proposal, when they approve or disapprove the minimum price, and the minimal terms at which the property should be sold. Furthermore I am persuaded that under the trustee's proposal two factors would deter potential bidders. First, the possibility must be faced and will be weighed by potential bidders, that more than one third in principal amount of certificate holders may disapprove of and thereby defeat a proposal to sell. Second, subject to the risk of such disapproval, there would be involved under the trustee's proposal the holding of a deposit and the earmarking of a large sum of money by the successful bidder pending submission of the plan to certificate holders. Operators who move quickly in a fast shifting market are loath to freeze their funds for any considerable period, subject to what they regard as the unrealistic reactions of many unworldly certificate holders who do not realize that the face

value is not necessarily the intrinsic value of a certificate. I accordingly approve that part of the proposed plan relating to the sale of the property, but direct that the notice to certificate holders be in such form, to be approved by the referee, as to fairly advise certificate holders that they may disapprove of the entire plan or of either part thereof. I also make a minor amendment, which is implicit but not expressed in the plan, that if the property is sold on terms and a purchase-money mortgage taken back, the certificate holders shall share pro rata in the new mortgage in a manner to be approved by the court in accordance with subdivision 6 of part I of the plan. Lastly, I modify the plan so as to provide that the minimum sales price, if on terms, shall be $800,000 instead of $765,000.

It is evident that the question as to whether the mortgaged property should be administered by a new corporation or by court supervised trustees in the event of failure to sell was threshed out thoroughly in the hearings before the referee. In this regard he states: " Viewing the situation only from the standpoint of protecting the certificate holders, I believe that operation by court supervised trustees would offer far greater safeguards. It appears, however, that the majority of counsel who appeared in the hearings before me have reached the conclusion that corporate ownership and management would be more feasible. Although I do not agree with that conclusion, I recognize that the corporate plan, which seems to be the choice of the majority of the counsel appearing before me, is not inherently dangerous to the certificate holders and the interests of the certificate holders can be adequately protected under such a plan. In view of the fact that the choice of one or the other should rest with the certificate holders, and because I feel that the Referee's judgment should not be given greater weight than the wishes of such counsel, I shall not disturb the conclusion reached by the majority of those who appeared before me and who presumably represent the certificate holders, and shall recommend that a corporate plan be adopted in the event that no sale of the property can be effected ''.

Until recently it was a moot question as to whether Burchill Act reorganizations were limited to corporate plans. This is the first plan to be submitted to the court since that question has been resolved. I am prepared to consider the all-embracing language used by the Appellate Division in the recent case of *Sterling Nat. Bank & T. Co.* v. *1231 Park Ave. H. Co.* (266 App. Div. 522, affd. 292 N. Y. 707), as authority for the appointment of trustees in Burchill Act reorganizations such as this.

While I, like the referee, believe that trustee operation is preferable to corporate operation, I shall nevertheless accept his recommendation. I am influenced by several factors, not the least of which is the fact that the recommended plan provides for closer court scrutiny and greater flexibility than any corporate plan that has yet come to my attention, and not the most compelling of which is the expressed desire of a majority of the certificate holders' representatives.

The major differences between trustee and corporate plans stem from the fact that in the former the court is generally implemented by the plan and declaration of trust, which provide direct control over the administration of the trust estate, while in the latter the stockholders, who are almost always identical with the bondholders, purport to exercise control through the election of directors and officers.

In evaluating the relative merits of court or bondholder control of the trust estate, I suppose that I cannot bring to bear complete detachment and objectivity. It is fair to state, however, that court supervision under a trustee plan is likely to be direct and real, but under a corporate plan when stock is widely held, stockholder control is likely to be merely a figure of speech. Or, when large blocks of bonds and stocks are held by one or more individuals or groups, a trustee plan can prevent control by the dominant stockholders, which is often to the detriment of minority stockholders. Of course, as in the plan under consideration, checks can be applied to safeguard the rights of all stockholders, but in this regard trustee plans lend themselves to the inclusion of both powers and safeguards with more facility than do the cumbersome instruments which must be drawn under a corporate plan within the framework of the Stock Corporation Law. The administrative expenses under both types of operation should be approximately equal. However, substantial savings can be effected under the trustee plan in initial or organization expenses.

In practice, trustees have proven more responsive to the court's proddings to make efforts to liquidate and to adopt certain policies than have corporation directors and officers. The remote control which article 4-A of the Real Property Law lodges in the court is impotent to dispel inertia or indifference or to curb abuses on the part of officers and directors of reorganization companies. However, it is too easy a generalization to tax corporate directors and officers with less desire to liquidate than has been evinced by trustees, in view of the fact that many trustee plans provide trustees and the court with

great powers to consummate a sale, while corporate plans have generally followed a pattern of divorcing the court of any control or supervision.

I also observe that most trustee plans have been by their provisions liquidating plans, while most corporate plans, particularly those consummated out of court, confront the best-intentioned of directors with almost insuperable obstacles in liquidating the bondholders' interests. This is essentially a criticism of such plans as have been promulgated, rather than of the potentialities of the corporate form of plan to embody a measure of self-regulating and liquidating implementation.

In this proceeding, all of the certificate holders who appeared before the referee, with the exception of the holder of one small bond, favored the corporate plan and specifically opposed any trustee plan. I am informed that among the certificate holders so minded are several banking institutions holding sizeable blocks of certificates. I must give some weight to this virtual unanimity. These representatives stressed before the referee that corporate ownership and management would be more feasible in respect of this hotel property, because it is of such a specialized nature that it will be best operated independently of the supervision of the court. I cannot accept this contention as such, although a desirable aspect of the corporate plan in this instance is that a board of directors can compositely offer a blending of skill and experience which would be highly desirable in the operation of a specialized business. Of course, a group of trustees can combine the same attributes and obviate the possible danger to the rank and file of the certificate holders of a group securing voting control.

The fact that the plan herein presented affords more stockholder safeguards and greater flexibility for liquidation purposes than any corporate plan that has come to my attention cancels out many of the advantages heretofore offered by trustee plans. It strikes a middle course between the almost completely court-controlled trustee plans, and the corporate plans in which the court is ousted of any voice whatsoever. I approve it primarily because of the same exigencies which impelled the referee to recommend it in this particular instance, expressing nevertheless my preference in most cases for the trustee plan.

In view of the new and important features which require somewhat detailed consideration, there is no point to setting forth the orthodox provisions of the second part of the plan at any greater length than to state that it provides for the organization of a corporation to take over the property in the event of

failure to sell. This corporation would be authorized to issue 7353 shares of common stock of a par value of $1 a share, and new twenty-year income bonds in an aggregate principal amount not exceeding $735,227.20, or 60% of the principal amount of the present mortgage indebtedness, to supersede the presently outstanding certificates. The new company will have five directors. The available net income for each annual income period shall be applied by the new trustee as follows: (a) first, to the payment of cumulative interest on the income bonds up to and including 3% per annum; (b) next, 33⅓% of the balance, if any, to the payment of additional noncumulative interest on the income bonds up to and including 3% thereof; and (c) the entire remainder, if any, to be paid into a sinking fund for the retirement of income bonds.

In the light of the proposed reduction in principal amount of the outstanding certificates, and the present and potential earnings of the hotel, for some years at least, it seems to me that 3% cumulative interest is somewhat low. Accordingly, the plan is amended so as to provide that 60% of the balance, if any, remaining after the payment of cumulative interest be applied to the payment of additional noncumulative interest on the income bonds, up to and including 4% thereof, and that the remainder, or 40%, be paid into the sinking fund.

A proposed indenture provision which represents an enlightened effort to improve the " boiler plate " indentures of the past reads as follows: " (c) Any of the terms or provisions of the New Indenture or of the New Income Bonds may be amended or modified at any time upon Court approval of such modification or amendment, unless within twenty days after such approval by the Court, the holders of one-third (⅓) or more in principal amount of all of the outstanding Income Bonds shall file with the Court duly acknowledged dissents therefrom. An application for such amendment or modification may be made by the New Trustee or by any holder or holders of 25% of the outstanding Income Bonds or by the New Company upon such notice as the Court shall fix in an order to show cause why such proposed amendment or modification should not be approved."

The above-quoted subdivision provides a simple, inexpensive procedure for amending or modifying the indenture in the future if exigencies arise which cannot be anticipated at this time. It in effect establishes a little Burchill Act proceeding within the four corners of the indenture, designed to meet many of the situations which have heretofore required the institution of costly and cumbersome proceedings under the Burchill Act itself.

The only modification I make of the foregoing subdivision is to provide for at least thirty days' notice to all bondholders of the modification or amendment for which court approval is sought prior to the granting of such approval, during which period bondholders may dissent. This modification will, among other things, permit bondholders unable to muster the requisite 33⅓% in dissents to advance reasons for the court's withholding its approval of the proposed modification or amendment.

The referee recommends the following indenture provisions:

" (d) The New Company may sell the mortgaged premises for such price and upon such terms as to cash or securities or both, free of the lien of the New Indenture or otherwise, as may be approved by the holders of 66⅔% of all outstanding shares of stock of the New Company and provided the approval of the Court for such sale shall be obtained. The net proceeds of such sale shall be distributed pro rata among the Income Bondholders to the extent necessary to pay to them the principal and accrued interest on their Income Bonds. Subject to the foregoing provisions such sale may be made even though the net proceeds thereof shall be insufficient to pay in full the principal amount of the Income Bonds, then outstanding and the interest, if any, accrued and unpaid thereon ''.

" (b) The New Company may from time to time and for any purpose borrow money by giving its bond and mortgage as security therefor, the lien of which new mortgage shall be superior to that of the New Indenture, provided that the holders of at least 66⅔% in principal amount of all outstanding Income Bonds shall consent thereto in writing and provided that such new mortgage shall be approved by the Court.''

I join a discussion of the mortgaging clause with that of the sales clause, because my reasons for amending the latter apply with equal force to the former. Since court and certificate holders' representatives must be guided by a solicitude single to the liquidation of the certificate holders' interests, the difficulty, if not the impossibility, of securing 66⅔% approval when the bonds and stock will be held by a large and widely dispersed number of persons is a most potent consideration. Ample court experience has proven that such a restriction is an almost insuperable handicap which frustrates the liquidation mandate of the statutes. Many certificate holders are unresponsive in the sense that they will neither consent nor approve. In some instances this diffidence is prompted by ignorance of financial matters. In other cases fiduciaries representing large blocks of bonds will take neither an affirmative nor a negative position

because of an excess of caution. It is my belief that no matter how meritorious the proposition, it is almost impossible to secure the consent of 66⅔% in principal amount of widely held securities to a sale or mortgage.

I therefore modify both paragraphs so as to provide that the mortgaged premises may be mortgaged or sold, as the case may be, with the approval of the court after a hearing on thirty days' notice by mail addressed to all holders of income bonds and stockholders of record, as the case may be, as their names and addresses appear on the books of the trustee at the time of mailing such notice, unless prior to the time of such hearing the holders of 33⅓% in principal amount of the outstanding income bonds or stock, as the case may be, shall file with the clerk of the court written objections to such mortgage or sale.

Care should be taken in the drafting of the certificate of incorporation and of all the instruments so as properly to avoid the limitations of sections 16 and 20 of the Stock Corporation Law in connection with the sale or refinancing of the property so that such a sale or refinancing may be effected in the manner provided for in this opinion.

Another indenture paragraph, (e), which I highly approve, provides that if an offer shall be made to the new company for the purchase of the mortgaged property and if the board of directors shall not approve the terms of such offer, nevertheless, on the written request of any director, the company shall submit such offer to the the holders of the outstanding shares of stock for their vote of consent or disapproval. I amend this paragraph so as to further provide that if an offer which has been disapproved by the board of directors is made known to the court, it may, in its discretion, direct a submission of the offer to the stockholders. Upon such submission, of course, the provisions of paragraph (d), as amended, shall control.

Finally, the referee has recommended that the directors of the new company render to the court an annual accounting of its financial operations, together with such other reports and data as the court may direct. A summary of the foregoing is to be mailed by the new trustee annually to the bondholders, and a motion is to be made by the new company on twenty days' notice to bondholders and to the new trustee for approval of the accounting. This provision, and another which subject to limitations in amount requires court approval of salaries of officers of the new company, provide at least a modicum of court supervision of the activities of the new company and compensate for the impotency of article 4-A of the Real Property Law in this respect.

The additional modifications or amendments which I desire to make are few in number. The operating liabilities which, as stated on page 32 of the plan, are to be paid in full or assumed by the new company, are to be limited to those incurred by the trustee since it took possession of the property. No mention is made of the fees to be paid to the new trustee. It shall submit a schedule of such fees to the referee who will consider them in conjunction with the certificate holders' representatives, and if satisfied of their reasonableness, will set forth the amounts of such fees in the instruments, to be effective until the event of default, if any.

The plan is further amended so as to provide that the court may, upon proof of unusual or extraordinary services rendered by any director or officer in effectuating the sale of the property, direct a bonus payment to such officer or director, the total amount of such bonus payment or payments to be additional to but not to exceed the sum which may be paid to officers and directors as compensation for any one year.

Counsel and referee have brought to bear upon their problems a fresh and vigorous approach from which has emerged a practicable and equitable plan, reflecting an intelligent effort to blueprint a dynamic rather than a static operation of the property and to extricate certificate holders from a distressed situation. The report of the referee is modified to the extent indicated above, and as so amended, is approved and adopted.

Settle order.